and the United States v. Liberatore, case number 23-8115. Good afternoon. Hold on one second. Okay. I think you're losing your audience. All right. I'll start over again. Good afternoon. The only real issue the jury had to consider, at least for purposes of this appeal, is whether there was sufficient evidence that Mr. Liberatore was aware that his computer was armed when they were in the store. That's the basis of his conviction as an accomplice for felony murder. And he is now serving 32 years in prison for that conviction, which is substantially longer than the sentences he received for the other two counts, which we are not challenging. The jury's finding that he was aware that Mr. Rallo was armed was skewed improperly by a number of errors. The first one is discussed in point one of the brief concerning expert testimony that there was a ballistic match between an alleged copper fragment found in a prior robbery, the Byram Jewelry Store robbery, which was committed by Mr. Liberatore alone, that that copper fragment matched the gun that was subsequently recovered from a co-defendant in the Marco robbery that had the victim, the dead victim's DNA on it. And I know it's a little confusing because there are two robberies. One was uncharged, but there was substantial proof of it. And the other one was the charged robbery committed by more than one person. This would be the best evidence that my client knew that Rallo was armed because the theory would be that he had a gun during the Byram robbery and he gave it to Rallo to use during the Marco robbery. But there are several problems with this theory. The first one is that there was no evidence that the gun discharged at the Byram robbery. I have cataloged in my brief at pages 14 and 15 and 32 and 33 all the many ways in which a discharge would be perceived if it had happened. There was, in this case, the store owner did not report a discharge. My client was charged with brandishing a weapon during the Byram robbery, not with discharging it. There was no report of a sound, which another government expert said would be very loud in that confined space. There was no flash of a gun firing in the video of the Byram robbery. There was no mark where a bullet struck the opposite side of the wall from the smashed cabinet. There was no mark anywhere, found anywhere, that a bullet had been found that had been fired. And there was also no shell casing found. And the SIG Sauer, from a government expert, is the type of gun which discharged What was the government's explanation for that? They did not have an explanation. They just – there was no counter to this lack of evidence that a gun was discharged, including the charging of brandishments instead of discharge. They simply asserted that it must have been fired because this copper fragment was subsequently found on the floor or somewhere in the Byram store. Now, that's another problem with this evidence, which is that the store's owner's son, because the store owner had since died from health problems, the store owner's son found a fragment two weeks after the Byram robbery, which he gave to Detective Franco. And the son described this simply as a little piece of metal. And the detective, Detective Franco, described it as a metal fragment which was silver. And yet the fragment tested by the ballistics expert was copper. So – and the other thing is that in Government Exhibit 6, there was a copper – by copper, I'm saying it was an orangey-colored fragment. That was the one that was tested by the ballistics expert, was in an envelope with other metal fragments. Sounds like a wonderful defense submission. I'm simply saying that – What is it that the jury projected? Well, I'm – What is – what's the error that you asked? Well, this leads up to the fact that we then have the testimony of a seriously impeached and weak ballistics expert who accordingly matched this copper fragment, which was found in an envelope with other fragments whose origin was never explained. She said they matched test-fired bullets from the Sig Sauer. Her qualifications were so seriously deficient that she was challenged as an expert by the defense. Then she gave, as I've detailed in the brief – You don't challenge that on appeal. No, I don't. But I'm just saying that if you look at the voir dire, there were certainly reasons why that challenge was made. In my experience, defense attorneys don't usually challenge an expert. And this one did. That's not before us. No. But her testimony – her qualifications were weak. Her testimony then about the match and her testing was also very troubling. As I've stated in the brief, she said that her first order of business when she makes – when she compares samples was to look at the class characteristics of the two samples. And she named five, but none of them were talked about in relation to this case. She admitted she couldn't determine the class characteristics of the fragment in GX6. She then compared the two items' individual characteristics for irregularities. She didn't report any. So then we get to her testimony about striations, which is the entire basis of her opinion that there was a match. She didn't explain what striations meant. She didn't explain what lands and grooves meant, if that was relevant. She didn't know the rifling for the Sig Sauer firearm. Is this a sufficiency argument that you're making?  Your Honor, I'm simply trying to show that her testimony, if the testimony of the uncalled expert had not been submitted, there would be a sufficiency argument by me, okay? And so this is why the uncalled expert's opinion was so incredibly important. So this is a competition clause issue. Yes. So critical. That's the argument. Yes. And the striation, just to finish this thought, the striations comparison that she made, she didn't discuss it. She didn't point to the pictures that are in our appendix at A64 to 66. She didn't discuss those pictures and why she thought they matched. And frankly, as a layperson, I don't see the match. I'm not, you know, on trial, but I'm just saying it wasn't obvious. So against all this backdrop that we're not sure the gun was fired at Byram, we don't know if we had the right fragment, and we have a very, very weak expert proffered by the government, we have evidence that was wrongfully submitted that an uncalled reviewer at the ballistics lab, who was a more senior reviewer than the one who was called as a witness, reviewed the evidence, analyzed the evidence, and came to her own conclusion, which was that there was a match. So let me ask you the following. His trial counsel, which was not you. No. He did cross-examine the expert, Ms. Beninati, regarding the ballistics report. Is that right? He cross-examined her regarding the ballistics report.  How would things have been any different for your client, practically speaking, if he also had the opportunity to cross-examine the other person involved in the report, Ms. Robichaux? Well, Judge LaLoyer, I don't know, because I don't know what Robichaux's qualifications were. I don't know what tests she performed. I know nothing about the analyses she made. All I know is her report. In the ballistics report that the government submitted as their own exhibit, the second uncalled reviewer signed off on the conclusion. But what did the trial counsel say? This is an unpreserved issue, which I've made clear. So it's plain error. It's definitely plain error analysis. So we don't know what the uncalled witness would have said had she been called to the stand, because she wasn't. But we don't know anything about her background, qualification, or the tests she performed or why she reached the same conclusion. I want to — I've outlined in the reply brief on pages 1 and 2 all the ways in which the government elicited on direct examination of their witness that there was not only an independent protocol in the lab for a second reviewer to review the first expert's findings and test the evidence, but, in fact, that that was done in this case. And then on summation, the prosecutor actually said, if you don't — even if you don't believe the testifying expert, go back and look at the second page of her report, the second reviewer who came to the same conclusion. So that shows that, according to the prosecutor, the signature of the technical reviewer level 2, the uncalled witness, was, in essence, the opinion of that reviewer that there was a match. You have a point, but if we're reviewing this for plain error, don't you really have to point to Supreme Court or Second Circuit precedent that makes the error, if it is an error, clear? And what do we look at to find that your argument, which is a fine argument in some respects, but I'm not sure you can argue that the error you are advocating as having been committed was clear? I think that the cases that I rely on in the brief all predated this trial by a number of years, and they include a string of Supreme Court cases that is, those cases are discussed on pages 27 and 28 of my brief. They talk about the rights to confrontation of forensic testimony, of forensic analyst report of findings. That it's not proper for a prosecutor to introduce an absent laboratory analyst testimonial out of Fort Stevens to prove the results of forensic testing. And that's exactly what was done in this case. So that was... You have reserved two minutes for rebuttal, and we'll hear from you and then we'll hear from you. Can I briefly discuss the second issue? I'll give you a minute. All right. All of this is driven by, again, the necessity of proving that my client knew that Mr. Rallo was armed. So the uncalled ballistics expert was one clear way in which the government got a leg up. And the second way they got a leg up was to be able to introduce lay opinion evidence that told the jurors what to make of the video clips and what my client could have heard and seen in the store at the time. This was not evidence that came from their specialized knowledge of being in the store. They didn't reenact the crime. They didn't take measurements to pinpoint where my client was at various points. They simply said, yeah, he looked at the bag going into the store and saw the gun. He saw the co-defendant take out the gun when they first entered the store and all of that. And all of those opinions bolstered the government's theory improperly. And the jury had the ability to review the clips and the evidence themselves and reach their own conclusion. Thank you very much. So we'll hear about all after we hear from the government. Thank you, Your Honors. My name is Jocelyn Courtney Kautzanis, and I represent the United States of America on this appeal. Thomas Libertor was convicted after trial of Adian Abedi in the brutal murder of Mark Buono and the robbery of jewelry from the jewelry store. It was not a violation of his Confrontation Clause rights, nor was it plain error to permit the ballistics examiner to say that a second examiner had reviewed her work. And it was similarly not error for any of the law enforcement witnesses to testify about the sight lines and layout of the video or what was happening on the video. So the government thought that the – well, let me ask you this way. Did the government think that the additional second reviewer's results were important to its case? Your Honor, the second reviewer's results were admitted only as part of – That's not my question. Did the government – is it the government's position that the results of the second reviewer, Jennifer Robichaux, were important to its case? No. So during closing arguments, as you heard from your friend on the other side, the prosecution told the jury, quote, even if you don't believe Rachel Beninati, the first reviewer, they – that is, the jury could still credit the results of the second reviewer, Ms. Robichaux. Why isn't that a strong indication that the government wanted the jury to rely on, for whatever reason, Robichaux's lab results for the truth of the matter asserted in her second review? And why isn't that an indication that it was important? I mean, look, I was a federal prosecutor. A summation is a – you have very little time, and it's – you focus on what's most important. So that suggests to me that that was not only pretty important, but also maybe a way to urge the jury to rely on that lab result for the truth. Your Honor, I think the response was a response to the reliability – an attack on the reliability of the first examiner's examination, which was the only reason that the fact that a second reviewer, as part of the quality control process, reviewed the work, even came up during the direct examination. And regardless, I think – Well, if it's for reliability, in other words, to corroborate, right, then your answer suggests to me that it was introduced for the truth of the matter. It was introduced as part of the reliability of the – what the processes in place that the lab had to make sure that the results of the testing were reliable. But regardless, Your Honor, I don't think that this Court needs to get into it, because as Judge Jacobs was pointing out, I mean, we're reviewing this now for plain error. Oh, I appreciate that. So this was not – But then you would have to rely on lack of prejudice. Right. And with regards to lack of prejudice, so this had pretty much – with regard to the overwhelming evidence that was introduced at trial, there was no substantial impact on the outcome. So to go over some of that evidence, Thomas Libertor was caught on video at the first robbery with a firearm. His fingerprints and his DNA were at the robbery – or at the getaway vehicle from the Byram Jewelers robbery. He left his license when he went to rent the car for the Byram Jewelers robbery. So even had Rachel Beninati not testified, there was still sufficient evidence that Thomas Libertor robbed the first jewelry store with a firearm 10 days before the second robbery. Then you get to the robbery of Marco Jewelers. The three defendants meet in the morning of that day, around 8 a.m. They're caught on video. They're in the car together all day during that day. They go into the store. At 157, there was a phone call between two of the phones, as the government argued at trial, likely between Prisano and Libertor – Mr. Libertor and Mr. Rallo. They go into the store. Mr. Libertor is caught on video looking into the bag before Mr. Rallo takes out the bag – takes out the firearm from the bag and aims it at Mr. Vuono. And then Mr. Libertor proceeds to rob the store while Mr. Rallo has the firearm out. So all of this was more than enough evidence that Mr. Libertor had advanced knowledge that a firearm would be used under Rosebond. So there's no – there's no – I just don't think there's any argument that's had a substantial impact on the outcome of the proceedings. Additionally, the other part of the plain error test, when you're looking at the reputation of the judicial proceedings, I mean, because this was not mentioned at all during the trial, and because the case law on this is also not clear – I mean, I would argue that the Supreme Court precedent on this, from Crawford to Melendez-Diaz, it's not at all clear that this type of testimony would be necessarily testimonial or a statement that would be in the line of cases. But what was the – what was the purpose? I'm sorry to belabor this, but – because I'm a little bit more focused on prejudice, but what was the purpose of having Robichaud's analysis? You just mentioned that it was for – to show that the first result was more reliable than it otherwise would appear to be, correct? Correct. And the primary purpose of that, knowing that the first result is for purposes of court testimony, why wouldn't that render Ms. Robichaud's report equally testimonial? Well, Your Honor, in Smith v. Arizona, the Supreme Court stated that this type of quality control might not be testimonial in nature. I mean, the lab – to satisfy – Sure. Under certain circumstances. But here, you just said that the reason that this was – that this second report was commissioned, was created, was to make – to enhance the reliability of the first report, which is only for purposes of court testimony. So, Your Honor, there was no second report. There's – there was one – Second analysis. Is that right? There – it's a little bit unclear from the record what exactly Jennifer Robichaud did and to what extent it was a full second analysis. Government Exhibit 124 has two signatures at the bottom. Rachel Venenati is the primary reviewer, and then there's a second signature of Jennifer Robichaud. But Robichaud says, yeah, what she said. Effectively.  I mean, she signs the report, yes. But again, I mean, if that's Your Honor's position, then I think you can focus on the – Well, I'm just asking a question because you seem to suggest that it's not testimonial, and I can't understand how it could not be testimonial, particularly if it's two people – two people signing effectively the same report. And you don't disagree that if it had just been the first report from Ms. Venenati, that that would have been testimonial? Correct, yeah. She was the witness who testified about her own findings, which is what is different from her analysis and her testimony than all of the cases by the Supreme Court in which they found that this type of testimony was improper. And if that's Your Honor's conclusion, I would also just say that if Jennifer Robichaud is considered to be an expert that the government has to call at trial because she reviewed the work, then there's a number of additional experts at every single trial the government would have to call because there are people in place who are checking at each step that the quality controls in place at the lab are working the way they're supposed to be. Does the record show whether reports such as this are ordinarily or routinely or required to be signed by a second expert? I think the record in terms of Rachel Venenati's testimony and the testimony of the DNA examiners who also had a second examiner on their report is that this is standard operating procedures by the lab that an independent reviewer reviews their work and signs the report. There was not testimony. Because this was not raised at trial, there was no testimony or questions about the extent of that review. That's part of the record. So... So if a third person had signed, then there would be a question as to whether you would have to have three people there testifying to the same piece of bullet. Absolutely, Your Honor. If you look at the record as to some of the DNA reviewers, you can see that there's a number of people that initialed things on the report that did various aspects of the testimony. So I think it becomes unworkable if we're going to say that every single person in the chain at the lab who certifies some aspect of what the testing was done has to be called as a witness at trial. I mean, that may be the long-term effect of Crawford, but that's a separate issue because you're really focused on prejudice. Yes, on all of the aspects of plain error because, again, this was not raised at trial. And then just to respond briefly to the second point as to the agents, the law enforcement agents that were called to testify, they testified based on their experience, their time with the defendant, their visits to the store to help explain some of the layout and the sight lines of the store. They narrated some of what happened on the video, but the video was played the entire time. They were cross-examined as to what happened on the video, and there was nothing improper about them explaining as an aid to the jury as the district court found out what was happening on the video. This also wasn't objected to at trial when they explained those things. So unless Your Honors have any further questions, we would rest on our papers, and for all these reasons. So I do have one more question on this forensic report. So is it your position that the government can introduce hearsay reports of, let's say, that there had been a line of people with initials or who had signed the report that they could introduce those reports of other experts on the ground that it's quality control? Yes, Your Honor, and I think that you can find support for that in Smith v. Arizona. I mean, the line of cases with the Supreme Court focus on surrogate testimony for an expert that's not in the courtroom. They don't focus on an expert who's testifying as to her conclusions and then other people who have certified different aspects of quality control in the lab review process. So that's a significant, I think, curtailment of the Crawford principle. I think that the Crawford principle, as applied, well, first of all, Crawford didn't get into its full coming, Melendez-Diaz, and the subsequent cases that get into the scientific technical reviewers. And I think that all of those support our position that they're really directed at making sure that the person who does the testing is in the courtroom, and here the person who did the testing was in the courtroom. Thank you.  Your Honors, the evidence here was not submitted as to the second examiner to show quality control. If you look at my reply brief on pages 1 and 2, the witness, the expert that testified was carefully led on direct examination to establish that the second reviewer had independently tested the evidence and come to her own independent conclusion. This was all on direct. When you say independently, is it suggested that a different test was performed? I don't know what test was performed. All I know is that the But we don't know because there was no objection. But the jury, well, I don't know if the witness at trial would know exactly what her supervisor did. That's not the point. The point is that she was used as a conduit to explain that the protocols required this be done and that the evidence was reviewed and the second reviewer performed her own examination, comes to their own conclusion. And in this particular case, did this happen? And she said yes. And then in terms of the floodgates being open to having to call multiple reviewers, I want to remind the Court that on summation, the prosecutor not only used the second reviewer's signing off for its truth, but she also told the jury that the mere electronic signature indicated that the second reviewer came to the same conclusion. So it was her instruction to the jury about what to draw from this signature that was important and show that it was for the truth. So let's go back and look at this report. And even if you don't believe Rachel Beninati, who is a firearm expert, or go back and look at the second page, the second reviewer who came to the same conclusion, even if Liberatore did not fire the gun, you saw the gun in the video. But that's what you're referring to. That's what I'm referring to, that she expressly told the jury that the electronic signature was not just quality control or a protocol. She said the second reviewer did what the testifying expert said. She reviewed the evidence, and she came to the same conclusion. Even if you don't believe the first expert? Right. And so it's not this is not a question of having to, you know, every time a report mentions somebody else involved in the reviewing process, the government has to call that person. Each case turns on its facts. And on these facts, there is no question that it was the government's design to use this second examiner to not just support the conclusion, but to say that the first examiner, no matter what the problems were, their testimony or qualifications, was correct. There was a match.  And therefore, my client knew that Rolla was armed. Thank you very much. Just goodbye. No questions. Not at all. Thank you very much. Thank you. We'll reserve the decision.